NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

---

| | | |
|---|---|---|
| A.W., | : | |
| | : | Civil Action No. 01-CV-140 (JLL) |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | OPINION |
| | : | |
| JERSEY CITY PUBLIC SCHOOLS, NEW | : | |
| DEPARTMENT OF EDUCATION, JEFFREY V. | : | |
| OSOWSKI, former Director, Division of Special | : | |
| Education, BARBARA GANTWERK, Director of | : | |
| Special Education Programs, SILVIA ELIAS, | : | |
| former Executive Director of Pupil Personnel | : | |
| Services, PRISCILLA PETROSKY, Associate | : | |
| Superintendent for Special Education, JOHN | : | |
| UNESCO, MARY HEPBURN, JOAN EDISON, | : | |
| DENISE BRAAK, MARY MACEACHERN, | : | |
| EDWARD FAUERBACH, Learning Disabilities | : | |
| Teacher-Consultants, NORMA CHRISOMALIS, | : | |
| GWENDOLYN JACKSON, LINDA COLON, | : | |
| RONNE BASSMAN, WILLIAM RONZITTI, | : | |
| ROXANNE JOHNSON, Supervisors of Special | : | |
| Education, SHARNETTE GREEN, teacher, | : | |
| MELINDA ZANGRILLO, Coordinator of | : | |
| Compliance, and JANE DOE and JOHN DOE (1)- | : | |
| (5), all in their official and individual capacities, | : | |
| | : | |
| | : | LINARES, District Judge |
| Defendants. | : | |
| | : | |

---

## **INTRODUCTION**

This matter is before the Court on the motion of defendants New Jersey Department of

Education, Jeffrey Osowski, Barbara Gantwerk, and Melinda Zangrillo for summary judgment

under Federal Rule of Civil Procedure 56. There was no oral argument. See Fed. R. Civ. P. 78. For the reasons set forth below, defendants' motion is GRANTED IN PART and DENIED IN PART.

## BACKGROUND

I.    *Law*

Before setting forth the relevant facts, the Court deems it useful to delineate the legal framework within which the instant dispute has arisen.

A.    General Framework

The Individuals with Disabilities Education Act ("IDEA") mandates the provision of federal government grants to the states "to assist them to provide special education and related services to children with disabilities ... ." 20 U.S.C. § 1411(a).[1] To become eligible for these federal funds, a state must submit a plan to the U.S. Department of Education assuring that the state has policies in effect which guarantee certain educational conditions. § 1412(a). Among these conditions is the availability of a "free appropriate public education" ("FAPE") for children with disabilities. § 1412(a)(1)(A). Other conditions include the identification and evaluation of all disabled children in a state, § 1412(a)(3), as well as the development and review of an "individualized education program" ("IEP") for "each child with a disability," § 1412(a)(4).

---

[1]On December 3, 2004, since the instant motion was filed, the IDEA was amended and certain of its provisions have been moved. See An Act to Reauthorize the Individuals with Disabilities Education Act, and for Other Purposes, Pub. L. No. 108-446, 118 Stat. 2647. To avoid confusion, the Court will cite only to the current version of the statute. As far as the Court is aware, none of the provisions to which the Court cites have changed materially from their previous language.

Special educational services may be furnished by either a state educational agency ("SEA") or a local educational agency ("LEA").  For an LEA to receive federal funds, it must submit a plan to the SEA assuring that the LEA is in compliance with all the state's IDEA requirements (e.g., FAPE and IEP development).  20 U.S.C. § 1413(a).  An LEA is moreover required to "ensure that all personnel necessary to carry out [the statutory mandates for provision of special educational services] are appropriately and adequately prepared."[2]  § 1413(a)(3).  In New Jersey, the LEAs (i.e., the school districts) are responsible for the direct provision of special educational services under the IDEA.  See N.J.A.C. § 6A:14-3.3.  Nevertheless, the SEA remains ultimately responsible for the provision of FAPE and other IDEA entitlements.  20 U.S.C. § 1412(a)(11).

Generally, special educational services commence as follows.  An SEA, LEA, or a child's parent requests an "initial evaluation" of the child to determine if the child has a disability.[3]  20 U.S.C. § 1414(a)(1).  After the evaluation, "a team of qualified professionals and the parent of the child" determine whether the child is in fact learning-disabled.  20 U.S.C. § 1414(b)(4).  If it is determined that the child is disabled, the LEA or SEA is required to have an IEP in effect for that child at the beginning of each school year.  § 1414(d)(2).

B.     Procedures to Ensure Compliance

---

[2]The same "personnel qualifications" requirement is imposed on SEAs.  See 20 U.S.C. § 1412(a)(14).

[3]"The term 'child with a disability' means a child – (i) with ... specific learning disabilities; and (ii) who, by reason thereof, needs special education and related services."  20 U.S.C. § 1401(3).  The term "specific learning disability" is defined as a "disorder" in one's "basic psychological processes involved in understanding or in using language," and "dyslexia" is included as one such disorder.  § 1401(30)(A)-(B); see also 34 C.F.R. § 300.7(c)(1).

The IDEA also provides certain procedural guarantees. A parent may "present a complaint ... with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child." 20 U.S.C. § 1415(b)(6). These complaints are processed in one of two ways. First, the parent may elect to have the complaint investigated by the SEA. See 34 C.F.R. § 300.661. Second, the parent may avail herself of an "impartial due process hearing," which is conducted by an SEA or LEA. 20 U.S.C. § 1415(f). These two options are not mutually exclusive, and a parent may choose both. 34 C.F.R. § 300.661

In New Jersey, complaint investigations are conducted by the State Director of the Office of Special Education Programs ("OSEP"). N.J.A.C. § 6A:14-9.2. Within 60 days of receiving a request for an investigation, the Director must report her findings. § 6A:14-9.2(e). In the event the LEA is found to be in noncompliance with the IDEA, it must submit a corrective action plan ("CAP") to OSEP. § 6A:14-9.2(f). The Director must then accept or reject the CAP, and she is thereafter responsible for verifying its implementation. § 6A:14-9.2(h)-(i).

If a parent opts for a due process hearing, such a request is also forwarded to the Director of OSEP. N.J.A.C. § 6A:14-2.7(c). If the parent declines to have the grievance mediated, as provided by the statute, or if such mediation fails, the complaint is forwarded to the Office of Administrative Law where a hearing is conducted by an administrative law judge ("ALJ"). § 6A:14-2.7(a), (d). In the event the parent is "aggrieved by the findings and decision" of the ALJ, the parent "shall have the right to bring a civil action with respect to the complaint presented ... in a district court of the United States, without regard to the amount in controversy." 20 U.S.C. § 1415(i)(2)(A).

4

II.    *Facts*

The following facts are either undisputed or conclusively established by the record:

Plaintiff was born on January 16, 1981.  He is dyslexic and has emotional problems.  In early 1988, while a first-grader at St. Paul's School, a private Catholic school in Jersey City, plaintiff was evaluated to determine his eligibility for special education under the IDEA.  On April 16, 1988, he was classified as neurologically impaired, and his initial IEP was developed.

Plaintiff enrolled as a second-grader in Jersey City Public Schools ("JCPS") in September 1988.  He remained in JCPS until February 2002, when he moved to Swainsboro, Georgia.  During these years, it appears that roughly fifteen IEPs were developed for plaintiff, although no IEP appears to have been in effect from April 1990 through January 1991.  Each of these IEPs, until he entered high school in 1995, placed plaintiff in a self-contained program for the neurologically impaired.  None of these, until January 2000, addressed his dyslexia.  Plaintiff was also subjected to numerous psychological assessments during this time.  These assessments purported to demonstrate, among other learning deficiencies, a drop in plaintiff's full scale IQ score from 103 to 77 during the years 1991 through 1997.

In December 1997, plaintiff's grandmother, through counsel, filed a request for a complaint investigation by defendant State Department of Education ("DOE") on behalf of plaintiff and other Jersey City students with dyslexia.  (See Compl. Investig. Request of 12/10/97.)  The request, directed to defendant Barbara Gantwerk, the Director of OSEP, sought an investigation into three purported failures of JCPS: (1) to diagnose dyslexia, (2) to provide adequate programs for dyslexic students, and (3) to train and supervise its teachers in special education.  (Id. at 2-10.)  On December 12, 1997, defendant Melinda Zangrillo, who shortly

thereafter became DOE's Coordinator of Compliance, was assigned to investigate the complaint.

On January 15, 1998, OSEP responded to plaintiff's request and stated that it would investigate the following issue: "Whether the education agency has adapted its written curricula to address the individual needs of pupils with educational disabilities in the area of reading." (Letter from Moyer to Athos of 1/15/98, at 1.)  Plaintiff's counsel objected to the narrowed scope of OSEP's planned investigation.  (Letter from Athos to Zangrillo of 2/6/98.)

On June 19, 1998, Ms. Gantwerk issued a complaint investigation report which set forth the findings of Ms. Zangrillo's investigation.  (See Compl. Investig. Report of 6/19/98.)  Ms. Gantwerk and Ms. Zangrillo deleted from this report the statement of a Houghton Mifflin employee who supposedly claimed that his company's reading program – a so-called "whole language instruction" program that JCPS used to teach its disabled students – could not be modified to address the needs of disabled students.  (Gantwerk Dep. at 35:10-16.)  Notwithstanding this omission, the OSEP report found deficiencies on the part of JCPS in adapting its reading curricula to address the needs of reading-disabled students.  (Compl. Investig. Report of 6/19/98.)  The report directed JCPS to develop a CAP identifying the steps it would take in correcting the problem.  (Id. at 5.)  JCPS submitted its CAP to the Hudson County Office of Education ("County Office"), and the County Office approved the CAP on October 27, 1998.  Plaintiff did not request a due process hearing at any time.

On January 28, 2000, a suitable IEP was implemented for plaintiff.  (Am. Compl. ¶ 46); see also A.W. v. Jersey City Pub. Schs., 2002 U.S. Dist. LEXIS 9369, at *6, 26 (D.N.J. May 1, 2002).  Specifically, the IEP set forth reading goals "prepared by an Orton-Gillingham specialist."  (Am. Compl. ¶ 46.)  Orton-Gillingham is an educational approach for combating

dyslexia, and plaintiff deems it effective.  (Id. ¶¶ 44-45.)

In addition to the aforementioned facts over which there is generally no dispute, the parties make the following assertions and denials:

Plaintiff alleges that, during his twelve years in JCPS, he "made minimal, if any, progress in the areas of reading, writing, and spelling."  (Pl.'s Statement of Material Facts ¶ 19.)  He attributes his academic struggles and concomitant emotional problems to many alleged deficiencies on defendants' parts.  Plaintiff claims that the Jersey City Child Study Team ("Jersey City CST") assigned to his case lacked knowledge about dyslexia and the type of educational programs used to combat it.  (Id. ¶ 20.)  He alleges that the Jersey City CST did not identify his dyslexia in part because State regulations failed to include the term.  (Id. ¶ 21.)  The administrators of special education in Jersey City, plaintiff submits, lacked the training to evaluate dyslexia and other reading disabilities.  (Id. ¶ 22.)

Plaintiff also asserts that in 1996 or thereabout, JCPS restructured its special education program to provide whole language instruction (i.e., the Houghton Mifflin reading series) to disabled students "at a time when whole language instruction was known to be ineffective for remediating reading disabilities."  (Id. ¶ 24.)  He contends that JCPS never even considered utilizing any reading program specifically designed for children with learning disabilities.  (Id. ¶ 23.)

The DOE, plaintiff submits, does not collect and maintain records of programs available to teach dyslexic students, does not collect and maintain information about teachers' training in the area of reading disabilities, and does not keep records concerning the individual expertise of DOE staff members.  (Id. ¶¶ 26-28.)  Plaintiff further alleges that DOE did not approve JCPS's

procedures for ensuring a comprehensive system of personnel development until May 2003.  (Id. ¶ 30.)  Plaintiff also asserts that DOE, during the relevant years at issue, undertook no initiatives to address reading disabilities, and that it has to date failed to collect research on adequate reading programs.  (Id. ¶¶ 32-33.)  The DOE, as a general matter, either denies these allegations or contends that JCPS, not DOE, is responsible for whatever educational deprivations plaintiff may have suffered.

With respect to the 1997 complaint investigation, plaintiff claims that he was afforded no relief as result of the investigation, and that the State retained no experts in conducting the investigation.  (Id. ¶¶ 56-57.)  State Defendants, on the other hand, maintain that, because neither federal nor state law requires diagnosis of dyslexia, they limited their investigation to the issue of whether children with reading disabilities were receiving an adequate education.  (Defs.' Statement of Facts ¶ 30.)  They further argue that the JCPS CAP appeared adequate and that it was appropriately implemented.  (Id. ¶¶ 43-45.)

This action was filed on or about January 10, 2001.  Plaintiff amended his Complaint on or about March 18, 2002.  His claims are as follows:

(1) Count I: IDEA violations by all defendants for denial of FAPE;

(2) Count II: IDEA violations by JCPS and DOE for failure to train and to adopt standards;

(3) Count III: IDEA violations by JCPS as enforced through 42 U.S.C. § 1983;

(4) Count IV: Violations of Section 504 of the Rehabilitation Act of 1973 by JCPS and DOE;

(5) Count V: Violations of Section 504 by JCPS as enforced through § 1983;

8

(6) Count VI: Violations of the IDEA and Section 504 by individual defendant employees of JCPS as enforced through § 1983;

(7) Count VII: Violations of the IDEA and Section 504 by individual defendant Sharnette Green as enforced through § 1983;

(8) Count VIII: Violations of the IDEA and Section 504 by defendants Gantwerk and Zangrillo as enforced through § 1983;

(9) Count IX: Violations by JCPS and DOE of Article VIII, § 4, ¶ 1 of the New Jersey Constitution; and

(10) Count X: Violations by JCPS and DOE of the New Jersey Law Against Discrimination ("LAD").

On May 1, 2002, the Court denied defendants' motion to dismiss under Rule 12(b)(6). See A.W. v. Jersey City Pub. Schs., 2002 U.S. Dist. LEXIS 9369 (D.N.J. May 1, 2002). On February 19, 2004, the Court, pursuant to certain parties' representations that this action had settled as to them, dismissed all defendants except DOE, Dr. Osowski, Ms. Gantwerk, and Ms. Zangrillo. (Order of 2/19/04.) These four defendants now move for summary judgment under Rule 56.

## DISCUSSION

I.    *Summary Judgment Standard*

A party is entitled to summary judgment when it demonstrates that there is no genuine issue of material fact and that the evidence establishes its entitlement to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Orson, Inc. v. Mirimax Film Corp., 79 F.3d 1358, 1366 (3d Cir. 1996). Put another way, summary judgment

will be granted when the evidence on the record "is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986). The movant carries the initial burden of supporting its motion, but once the movant has satisfied this burden, the opposing party must then "produce specific facts" sufficient to "create a fair doubt" over whether the movant should prevail. Jersey Cent. Power & Light Co. v. Lacey Township, 772 F.2d 1103, 1109 (3d. Cir. 1985). The non-moving party cannot rest on mere allegations and must instead present actual evidence that creates a genuine issue as to a material fact for trial. Fed. R. Civ. P. 56(e); Siegel Transfer, Inc. v. Carrier Express, Inc., 54 F.3d 1125, 1130-31 (3d Cir. 1995). In considering a motion for summary judgment, the Court views all evidence in a light most favorable to the party opposing the motion. Brewer v. Quaker State Oil Ref. Corp., 72 F.3d 326, 330 (3d Cir. 1995).

II.    *Analysis*

    A.    Exhaustion of Administrative Remedies

Defendants first argue that this Court lacks jurisdiction over this case, because plaintiff failed to exhaust his administrative remedies under 20 U.S.C. § 1415(i)(2). Plaintiff counters that Judge Bassler squarely addressed this issue in his May 1, 2002 Opinion, and that this issue should not be litigated once again. The Court agrees with plaintiff.

"Under the law of the case doctrine, once an issue is decided, it will not be relitigated in the same case, except in unusual circumstances." Hayman Cash Register Co. v. Sarokin, 669 F.2d 162, 165 (3d Cir. 1982). On May 1, 2002, Judge Bassler rejected defendants' administrative exhaustion arguments. See A.W. v. Jersey City Pub. Schs., 2002 U.S. Dist. LEXIS 9369, at *24-27 (D.N.J. May 1, 2002). He reasoned that, because "plaintiff's dyslexia

has now been identified and a suitable IEP implemented," no administrative remedies were available to plaintiff after January 28, 2000, the date the IEP was established.[4]  Id. at 26-27. Defendants submit no new evidence tending to suggest that the basis of Judge Bassler's decision is no longer valid.  Nor does the Court find anything clearly erroneous about Judge Bassler's ruling.[5]  The circumstances here are thus anything but "unusual," see Hayman, 669 F.2d at 165, and the Court declines to entertain defendants' exhaustion arguments.

B.    Statute of Limitations

Defendants next contend that this action is time-barred.   All claims related to plaintiff's IEPs developed in and prior to August 1997, they submit, fall outside the two-year limitations period.  Defendants further maintain that Count VIII of the Amended Complaint, which asserts IDEA and § 504 claims against Ms. Zangrillo and Ms. Gantwerk, is also time-barred, because the actions therein complained of culminated in the issuance of a complaint investigation report in

---

[4]Defendants' argument that Judge Bassler "did not consider whether A.W. had a viable administrative remedy available at the time of the alleged wrongdoing but, rather, only considered whether the relief sought by A.W. could be obtained in a due process hearing at the time the motion was decided" (Defs.' Reply Br. at 2), is frivolous.  While Judge Bassler employs present tense language, his analysis clearly contemplates the availability vel non of administrative remedies after the implementation of the suitable IEP, not as of the date he decided the motion.  See A.W., 2002 U.S. Dist. LEXIS 9369, at *26-27 ("Plaintiff does not seek to challenge his IEP, his educational placement going forward, or any other aspect of his present educational circumstances. ... Instead, Plaintiff seeks a declaration that his rights were violated in the past, and seeks monetary relief to make him whole for injuries allegedly suffered as a result of Defendants' past failures.").

[5]Indeed, because plaintiff availed himself of the complaint investigation procedure, there may even be alternative grounds for holding as Judge Bassler did.  See Lucht v. Molalla River Sch. Dist., 225 F.3d 1023, 1028-29 (9th Cir. 2000) (finding the IDEA's complaint resolution procedure and the due process hearing procedure to be alternative means for a parent or agency to lodge an administrative grievance).

June 1998, more than two years before this action was filed. Plaintiff counters that defendants' conduct constituted a continuing violation, and that the statute of limitations was tolled while he was a minor.

The parties are in agreement that the applicable limitations period for IDEA claims is two years. See Ridgewood Bd. of Educ. v. N.E., 172 F.3d 238, 251 (3d Cir. 1999). Therefore, if the claims herein asserted had accrued before January 10, 1999, two years prior to the filing of this action, these claims are time-barred.

While State law furnishes the limitations period, federal law governs the question of when a cause of action accrues. Sandutch v. Muroski, 684 F.2d 252, 254 (3d Cir. 1982). With respect to plaintiff's continuing violation doctrine argument, the Third Circuit has not yet ruled that the doctrine applies to IDEA claims, but at least two district courts within the Circuit, including this Court, have arrived at that conclusion. See F.P. v. State of New Jersey, No. 00-2217, 2001 U.S. Dist. LEXIS 25212, at *11-14 (D.N.J. June 28, 2001); Jeffery Y. v. St. Mary's Area Sch. Dist., 967 F. Supp. 852, 855 (W.D. Pa. 1997). F.P. and Jeffery Y. appear to comport with general Third Circuit jurisprudence in this area, see, e.g., Brenner v. Local 514, United Bhd. of Carpenters, 927 F.2d 1283, 1295 (3d Cir. 1991) ("In most federal causes of action, when a defendant's conduct is part of a continuing practice, an action is timely so long as the last act evidencing the continuing practice falls within the limitations period."), and the Court adopts these. The only remaining issue, therefore, is when the alleged continuing violations ceased.

The record here appears to reflect that plaintiff's IEPs continually placed him in self-contained programs for the neurologically impaired – without success, as evidenced by his academic and psychological evaluations during these years – and that each of those IEPs failed to

address his dyslexia.  Indeed, defendants are unable even to produce an IEP for the period of

April 1990 through January 1991.  Further, as discussed in detail <u>infra</u>, there are relevant issues

pertaining to the DOE's allegedly deficient investigation into plaintiff's 1997 complaint.

There is also evidence to suggest that State defendants failed to oversee implementation

of the JCPS CAP, as is required by law.  <u>See</u> N.J.A.C. § 6A:14-9.2(i).  Specifically, Ms.

Zangrillo, arguably revealing that she and others at OSEP did not feel accountable for the quality

or effectiveness of the CAP, has asserted that the County Office, rather than the DOE, was the

authority responsible for implementation of the CAP, which was approved by the County Office

in October 1998.[6]  (Zangrillo Certif. ¶ 30.).  And while the CAP did provide for instruction to

disabled students by the Orton-Gillingham method (CAP Special Educ. Reading Program at 5),

which method plaintiff deems sufficient for students with dyslexia (Am. Compl. ¶¶ 44-45), there

appears to be a factual issue as to whether plaintiff received such instruction before May 2000,

when his suitable IEP allegedly took effect.  <u>See</u> <u>A.W.</u>, 2002 U.S. Dist. LEXIS 9369, at *6, 26.

State defendants were required to "review and verify the implementation" of the CAP and take

action in the event it was not implemented.  N.J.A.C. § 6A:14-9.2(i)-(j).  An eighteen-month

delay could reasonably be deemed a failure of implementation.

For purposes of this motion, therefore, the record reflects that there are genuine issues of

---

[6]The Court appreciates that the State Administrative Code during the relevant period provided for county office involvement.  <u>See</u> 30 N.J. Reg. 2468-69 (July 6, 1998).  Nevertheless, the regulation at that time did not, as defendants seem to suggest, absolve the DOE of responsibility for CAP approval and implementation by passing these duties to the relevant county office.  To the contrary, CAPs were to be "submitted <u>to</u> the Department of Education <u>through</u> the county office of education."  <u>Id.</u> at 2468 (emphasis added) (setting forth old § 6A:14-9.2(e)).  Furthermore, the DOE was still ultimately responsible for taking action in the event implementation was a failure.  <u>Id.</u> at 2469 (setting forth old § 6A:14-9.2(i)).

material fact as to whether State defendants, who were ultimately responsible for ensuring plaintiff received FAPE and related services during the relevant years,[7] violated the IDEA. For these reasons, the Court holds that the limitations period was triggered, at the earliest, on January 28, 2000, the date the suitable IEP was developed and thus the first possible date the alleged violations of the IDEA could have ceased. Consequently, plaintiff's action is timely.[8]

C.    Enforcement of IDEA Through § 1983

Defendants also argue that, notwithstanding the clear holding of W.B. v. Matula, 67 F.3d 484 (3d Cir. 1995), the Court should find that 42 U.S.C. § 1983 may not be used to enforce the IDEA. They reason that Gonzaga Univ. v. Doe, 536 U.S. 273 (2002), which held that no private cause of action existed under FERPA, as that statute contained no unambiguously conferred right enforceable under § 1983, effectively overturned Matula.[9] The Court disagrees. Unlike FERPA, the IDEA does contain individual "rights-creating" language and individually-based enforcement mechanisms. Gonzaga, 536 U.S. at 283-89. These IDEA provisions include 20 U.S.C. § 1415(b)(6) (right to present individual complaint), § 1415(i)(2) (right to bring civil action), and §

_____

[7]The Court discusses this aspect of the IDEA in Part II.F.1, infra. See 20 U.S.C. § 1412(a)(11) (providing that SEA is responsible for ensuring IDEA compliance, even if programs are administered by LEA); Kruelle v. New Castle County Sch. Dist., 642 F.2d 687, 696 (3d Cir. 1981); cf. Beth V. v. Carroll, 87 F.3d 80, 87 (3d Cir. 1996) (discussing the breadth of the provision concerning SEA responsibility and finding that it encompasses a state's general duty to provide FAPE).

[8]Having decided that the continuing violation doctrine renders plaintiff's claims timely, the Court declines to consider whether the limitations period for IDEA claims is tolled while plaintiff is a minor.

[9]Defendants do not squarely argue this, but if this is not their contention, then they are arguing that the Court should disregard Matula altogether. Clearly, only one judicial body is able to overrule Third Circuit precedent, and this Court is not it.

1415(l) (rule of construction).  Defendants' motion in this respect is thus DENIED.

D.    Private Cause of Action Under the IDEA

Defendants submit that the IDEA does not provide for a private cause of action.  This argument was rejected in Beth V. v. Carroll, 87 F.3d 80, 88 (3d Cir. 1996), which held that, "[c]onsistent with the palpable nexus between the provision of a free appropriate public education mandated by IDEA and the DOE regulations requiring procedures for bringing complaints of violations of IDEA and related regulations to the attention of the state agency," section 1415 of the IDEA provides an "express right of action."  Indeed, the core of plaintiff's Amended Complaint as it pertains to the State defendants is strikingly similar to the allegations at issue in Beth V., in that State defendants are alleged to have inadequately investigated plaintiff's complaint and ignored the longstanding deprivation of FAPE.  See id. (plaintiffs alleged that state department of education consistently failed to investigate IDEA complaints).  As such, Beth V. squarely addresses the facts at issue here.  Defendants' motion in this regard is DENIED.

E.    Qualified Immunity of Individual Defendants

The Court next addresses defendants' argument that Count VIII, which alleges section 504 and IDEA violations by Ms. Zangrillo and Ms. Gantwerk, should be dismissed because those individuals are entitled to qualified immunity.  As a general matter, a public official will be immune from suit if her actions were objectively reasonable.  Anderson v. Creighton, 483 U.S. 635, 639 (1987).  The inquiry into the official's reasonableness involves two steps: first, the Court must determine whether the facts as alleged demonstrate a violation of a federal right; and

second, if the first question is answered in the affirmative, the Court must further determine whether the right was "clearly established ... in light of the specific context of the case." Saucier v. Katz, 533 U.S. 194, 201 (2001). In light of this rather government-friendly standard, the qualified immunity defense provides "protection to all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986).

With respect to the first inquiry, the Court concludes that the facts as alleged demonstrate a violation by these individual defendants of the IDEA. As discussed, in this State, which receives federal funds, every disabled child is entitled to FAPE. See 20 U.S.C. § 1412(a)(1). Dyslexia is a qualified disability under the IDEA, § 1401(30)(A)-(B), and dyslexic children thus have a right to FAPE. FAPE "must be tailored to the unique needs of the disabled student" through an IEP. Ridgewood Bd. of Educ. v. N.E., 172 F.3d 238, 247 (3d Cir. 1999) (citing Bd. of Educ. v. Rowley, 458 U.S. 176, 181-82 (1982)). An IEP "must provide 'meaningful' access to education and confer 'some educational benefit' upon the child for whom it is designed." Id. (quoting Rowley, 458 U.S. at 192, 200) (internal citations omitted). These rights are enforceable through the IDEA's procedural mechanisms. See 20 U.S.C. § 1415(b)(6), (f). When a parent files a complaint, she is entitled to an investigation and "a written decision ... that addresses each allegation in the complaint ... ." 34 C.F.R. 300.661(a). If that investigation demonstrates noncompliance by an LEA, a CAP must be implemented, and the OSEP must approve that CAP and verify its implementation. N.J.A.C. § 6A:14-9.2(f), (i).

Plaintiff's allegations, many of them supported by substantial evidence, demonstrate violations of these rights. He alleges that he made virtually no academic progress over the course of a dozen years; that his evaluations failed to identify his dyslexia; that his IEPs, until 2000,

16

failed to account for his dyslexia; that his complaint to OSEP was not adequately addressed and investigated; that JCPS' CAP failed to yield results; and that the defendants were, systemically, incapable of administering to his specific needs.

The alleged participation of Ms. Zangrillo and Ms. Gantwerk in these violations is significant. Ms. Zangrillo, who was responsible for investigating plaintiff's 1997 complaint, declined to investigate JCPS' failure to diagnose dyslexia on the grounds that "there was no federal or state requirement to do so." (Zangrillo Dep. at 36:23-25.) These grounds are contrary to law, see 20 U.S.C. § 1412(a)(3) (setting forth requirement to "identif[y], locate[], and evaluate[]" disabled children); § 1401(30)(A)-(B) (including "dyslexia" within the definition of a "specific learning disability"); §§ 1412(a)(14), 1413(a)(3) (requiring SEA and LEA to ensure all personnel are prepared and trained to serve disabled children), and plaintiff's counsel notified Ms. Zangrillo of the applicable law in a letter dated four months before the final report was issued (Letter from Athos to Zangrillo of 2/6/98). Ms. Gantwerk, charged by statute with overseeing the complaint process, see N.J.A.C. § 6A:14-9.2, approved the limited investigation and issued a report that failed to address all of plaintiff's grievances, see 34 C.F.R. 300.661(a). Significantly, both defendants admit to removing from an earlier draft of the report a statement by a Houghton Mifflin representative that appears highly relevant to the investigation. The statement was that the company's whole language instruction program, which JCPS is alleged to have employed exclusively for its special education students, "could not be modified to meet the needs of students with disabilities." (Gantwerk Dep. at 35:10-16.) Indeed, Ms. Zangrillo has testified that she removed the finding because "Dr. Osowski indicated that he didn't want anything in the report that would lead people to believe that the Houghton-Mifflin reading series

17

was not a good reading series ... ."  (Zangrillo Dep. at 67:23-68:12.)  This omission has much

potential importance, considering that plaintiff's complaint involved JCPS' alleged failure to

teach disabled children how to read, that the statement itself evidences IDEA noncompliance

since the inception of the Houghton Mifflin method, and that JCPS is alleged to have continued

to use the method for at least another eighteen months (Pl.'s Statement of Facts ¶¶ 24-25; see

also Special Educ. Plan for the 1996-7, 1997-98, and 1998-99 School Years, at 35-36, 38

(discussing whole language techniques)).  To be sure, JCPS' CAP provided for Orton-

Gillingham instruction, but defendants have pointed to no evidence that plaintiff received such

instruction before his January 2000 IEP was developed.

     When these acts and omissions are considered with the evidence that plaintiff, in

seemingly stark contrast to what his potential appeared to be when he entered JCPS as a second-

grader, was woefully deficient academically – evidence which was available to both Ms.

Zangrillo and Ms. Gantwerk during the investigation – the alleged violations of the IDEA

become even more clear.  See Polk v. Cent. Susquehanna Intermediate Unit 16, 853 F.2d 171,

185 (3d Cir. 1988) (holding that the "meaningful" educational benefit to which a disabled child is

entitled "must be gauged in relation to the child's potential").  In sum, these facts, if proven,

clearly demonstrate a deprivation of plaintiff's rights under the IDEA.

     With respect to the second inquiry under Saucier – whether the right was clearly

established in light of the context of these facts – the Court again concludes in the affirmative.

All of the aforementioned statutes and regulations were in effect during the complaint

investigation process.[10]  In fact, Ms. Gantwerk and Ms. Zangrillo were investigating plaintiff's

complaint pursuant to those statutes and regulations.  It cannot therefore be said that it would

have been "difficult for [defendants] to determine how the relevant legal doctrine ... appl[ied] to

the factual situation [they] confront[ed]."  Saucier, 533 U.S. at 205.  That Ms. Gantwerk and Ms.

Zangrillo claimed at the time to be unaware of the relevant standards concerning the duty to

diagnose certain disabilities is of little consequence.  See Harlow v. Fitzgerald, 457 U.S. 800,

818-19 (1982) (ignorance of law must be "reasonable").  The claim is moreover dubious

considering the nature and importance of these defendants' particular positions, as well as the

fact that plaintiff's counsel had identified much of the applicable law prior to or during the

investigation.  Accordingly, there is sufficient evidence on the record for a reasonable jury to

determine that defendants Gantwerk and Zangrillo knowingly violated clearly established federal

law.  See Malley, 475 U.S. at 341; Saucier, 533 U.S. at 201; Hicks v. Purchase Line Sch. Dist.,

251 F. Supp. 2d 1250, 1254-55 (W.D. Pa. 2003).

  This analysis applies with equal force to defendants' arguments concerning Section 504.

See W.B. v. Matula, 67 F.3d 484, 492-93 (3d Cir. 1995) (discussing the extensive overlap

between the IDEA and Section 504).  With respect to Section 504, however, defendants submit

an additional argument, namely, that Ms. Zangrillo and Ms. Gantwerk cannot be sued under

---

[10]Defendants' reliance on S. Camden Citizens In Action v. Dep't of Envtl. Protection, 274
F.3d 771, 790-91 (3d Cir. 2001), for the proposition that "a regulation cannot create a right
enforceable through § 1983 where the alleged right does not appear explicitly in the statute," is
misplaced.  (Defs.' Reply Br. at 14.)  Unlike in Citizens, the rights at issue here, such as to FAPE
and its concomitant procedural safeguards, arise from the IDEA itself, not the regulations.  See,
e.g., 20 U.S.C. §§ 1412(a)(1), 1415(a)(6).  Consequently, while the regulations, rather than the
IDEA, set forth the specific complaint investigation process, "the federal right [is] present in the
statute."  Citizens, 274 F.3d at 790.  The regulations, by contrast, merely "flesh out the content of
[the] specific right[s]" – rights that were clearly contemplated by Congress.  Id.

Section 504 as they are not recipients of federal funds.  See Emerson v. Thiel College, 296 F.3d

184,190 (3d Cir. 2002).  Nevertheless, in Emerson, the individual defendants had been sued only

under Section 504, not under § 1983 to enforce rights secured by Section 504.  See id. at 186.  In

Matula, on the other hand, the court allowed the plaintiff's § 1983 claim predicated on Section

504 to proceed against nine individual defendants.  Id. at 491, 494.  Accordingly, the Court must

assume that the Third Circuit intended Emerson to apply only to causes of action brought directly

under Section 504 against individual defendants.  Emerson does not therefore apply to Count

VIII, which is brought under § 1983.  This conclusion is reinforced by the fact that both cases

cited by Emerson in support of its holding in this regard, Garcia v. S.U.N.Y. Health Sciences

Ctr., 280 F.3d 98 (2d Cir. 2001), and Smith v. Metro. Sch. Dist., 128 F.3d 1014 (7th Cir. 1997),

involved statutory claims against individual officials sued directly under the statutes themselves,

rather than through § 1983 for violations of those statutes.  For these reasons, defendants' motion

for summary judgment on qualified immunity and other grounds with respect to the individual

defendants is DENIED.

F.    State Liability Under IDEA and Section 504

        Defendants contend that, as a matter of law, the DOE did not violate the IDEA or Section

504.  First, they argue that the DOE cannot be held liable for JCPS' alleged failure to provide

FAPE, reasoning that JCPS is directly responsible for special education services, and that there is

no respondeat superior liability under either statute.  Second, defendants argue that the DOE did

not intentionally discriminate against plaintiff, and that plaintiff is not an individual "otherwise

qualified" under Section 504.  Third, defendants argue that monetary damages cannot be awarded

under the IDEA.  For these reasons, they submit, Counts I, II, and IV of the Amended Complaint

should be dismissed.

        1.        Whether the DOE May be Held Liable for JCPS' Deficiencies

As discussed briefly in Part II.B, supra, the DOE is ultimately responsible for IDEA

compliance.  See 20 U.S.C. § 1412(a)(11); Beth V. v. Carroll, 87 F.3d 80, 87 (3d Cir. 1996).

Indeed, defendants' argument to the contrary was squarely rejected in Kruelle v. New Castle

County Sch. Dist., 642 F.2d 687, 696 (3d Cir. 1981).  Kruelle, quoting the relevant Senate

Report, stated:

> Without this requirement [that a single agency be responsible for providing FAPE and the like], there is an abdication of responsibility for the education of handicapped children.  Presently, in many States, responsibility is divided, depending upon the age of the handicapped child, sources of funding, and type of services delivered.  While the committee understands that different agencies may, in fact, deliver services, the responsibility must remain in a central agency overseeing the education of handicapped children, so that failure to deliver services or the violation of the rights of handicapped children is squarely the responsibility of one agency.

642 F.2d at 696; see also M.A. v. State-Operated Sch. Dist., 344 F.3d 335, 340 (3d Cir. 2003)

(citing Kruelle for same proposition).

In addition, the alleged conduct of State defendants Zangrillo and Gantwerk, as discussed

at length in Part II.D., supra, renders any discussion of respondeat superior liability inapposite,

because the State defendants directly participated in some of the alleged violations.  The DOE

may be held liable under the IDEA.

        2.        DOE Liability Under Section 504

In order to establish a violation of Section 504,[11] plaintiff must prove (1) that he is

disabled, (2) that he is "otherwise qualified" to engage in school activities, (3) that the DOE

receives federal funds, and (4) that he was "excluded from participation in, denied the benefits

of, or subject to discrimination at, the school."  Ridgewood, 172 F.3d at 253.

The Court rejects defendants' argument that Section 504 requires intentional

discrimination.  Third Circuit precedent is precisely contrary.  Id.  Defendants' citation to Barnes

v. Gorman, 536 U.S. 181 (2002), which briefly discussed the required mental state for actionable

violations of Spending Clause legislation, is unpersuasive.  Barnes dealt solely with the scope of

remedy available under Section 504.  Id. at 185.  It held only that, because punitive damages are

unavailable under Title VI – Title VI being the source of remedies available under Section 504,

see 29 U.S.C. § 794a(a)(2) – such damages are similarly unavailable under Section 504.  Barnes,

536 U.S. at 189.  As such, the Supreme Court's language concerning the need for intentional

conduct for liability to attach under Spending Clause legislation is dicta.  See id. at 186-87.

Moreover, even were the Court to adopt Barnes' dicta pertaining only generally to Spending

Clause legislation and thereby reject the Third Circuit's explicit holdings that Section 504

violations need not be intentional, Ridgewood, 172 F.3d at 253 (citing W.B. v. Matula, 67 F.3d

484, 492 (3d Cir. 1995)), defendants would still not be entitled to summary judgment on the

current record.  Once again, there is sufficient evidence, including the omission by State

defendants of relevant information from the complaint investigation report, to allow any issue of

---

[11]Section 504 provides, in relevant part: "No otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance ... ."  29 U.S.C. § 794(a).

intent to go to the jury.

Defendants' argument that plaintiff is not "otherwise qualified" is likewise without merit. For disabled public school children, age is the only requirement to qualify for Section 504 protection. Oberti v. Bd of Educ., 801 F. Supp. 1392, 1405 (D.N.J. 1992), aff'd, 995 F.2d 1204 (3d Cir. 1993); 34 C.F.R. § 104.3(l)(2). It is not disputed that plaintiff was of school age when all the complained of conduct allegedly took place. For these reasons, defendants' motion is DENIED insofar as it seeks summary judgment on plaintiff's Section 504 claims.[12]

3.    Availability of Monetary Damages Under the IDEA

Puzzlingly, defendants cite to W.B. v. Matula, 67 F.3d 484, 494 (3d Cir. 1995), for the proposition that "monetary damages are not available under IDEA itself." (Defs.' Br. at 20-21.) The relevant language in Matula is as follows: "[E]ven were we to limit our focus to IDEA itself, we discern nothing in the text or history suggesting that relief under IDEA is limited in any way, and certainly 'no clear direction' sufficient to rebut the presumption that all relief is available." 67 F.3d at 494-95. While Matula addressed § 1983 claims, arguably rendering the above passage dicta, the Court is utterly unable to glean anything from this language other than the opposite of defendants' assertion. It is presumed that, unless Congress clearly directs otherwise, any appropriate relief is available under a federal statute. Franklin v. Gwinnett County Pub. Sch., 503 U.S. 60, 70-71 (1992). Consistent with Matula's observations, defendants have cited to nothing in the IDEA that would indicate congressional intent to preclude certain remedies.

---

[12]Defendants assert the same arguments concerning the State's culpability and the like with respect to plaintiff's NJ LAD claim. (See Defs.' Br. at 40.) These arguments are likewise rejected.

Further, in Barnes, the Supreme Court clearly identified the availability of compensatory

damages for violations of Spending Clause legislation.[13]  536 U.S. at 186-89.  In any event, the

Court is persuaded by Matula's analysis and holds that monetary damages are available under the

IDEA itself.

In their reply brief, defendants cite to a different portion of Matula, which states that the

"IDEA itself makes no mention of [money damages]."  (Defs.' Reply Br. at 9 (quoting Matula,

67 F.3d at 496).)  This part of the Matula opinion, however, addressed exhaustion of

administrative remedies; that is, it was analyzing whether the relief sought in civil procedures

(i.e., money damages) was a form of relief "also available" through administrative procedures

under the IDEA.[14]  See Matula, 67 F.3d at 496.  This analysis is altogether different than the

analysis concerning whether money damages are available in a civil action under the IDEA as a

general matter, and Matula ostensibly performed the latter analysis in the language quoted above.

See 67 F.3d at 494.  For these reasons, defendants' motion for summary judgment in this regard

---

[13]The Court is unpersuaded by defendants' argument that Barnes' identification of
compensatory damages can be interpreted as only providing for compensation in the form of
special educational services.  (Defs.' Reply Br. at 10.)  Such a holding would either leave adult
plaintiffs, such as the plaintiff here, without a remedy, or produce the absurd result of elementary
and high schools providing remedial education to adults who were denied FAPE during their
school-age years.  At the least, it would appear that an aggrieved plaintiff could be compensated
monetarily for expenses incurred in connection with providing himself the education to which he
was entitled under the IDEA.  See Matula, 67 F.3d at 484 (identifying "reimbursement for
providing at private expense what should have been offered by the school" as an available IDEA
remedy).  Such compensatory damages are different in character than the "tort-like" damages
found unavailable under the IDEA in other Circuits.  See Ortega v. Bibb County Sch. Dist., 397
F.3d 1321 (11th Cir. 2005) (holding that, where parents sued school for wrongful death as a
result of alleged IDEA violations, tort-like damages were unavailable).

[14]The same can be said of Judge Bassler's language in the Court's Opinion of May 1,
2002, which defendants cite in further support of this proposition.  See A.W., 2002 U.S. Dist.
LEXIS 9369, at *25-26.

is DENIED.

G.     Plaintiff's Claims Against the State for Declaratory Relief

In its prayer for relief, the Amended Complaint asks for "judgment pursuant to 28 U.S.C. § 2201 declaring that defendants have violated plaintiff's rights as set forth above." (Am. Compl. Demand, ¶ B.) Defendants argue that there is no case or controversy before the Court warranting a grant of declaratory relief. The Court agrees.

Plaintiff has no need for declaratory relief. See Prior v. Nat'l Collegiate Athletic Ass'n, 288 F.3d 548, 561 (3d Cir. 2002). Being an adult, there is no possibility that his rights could be violated by defendants in the future. See id. Also, plaintiff shall be entitled to argue to a jury that defendants violated his rights in the past. If he succeeds, he shall be awarded damages. A declaratory judgment in this context would thus be utterly superfluous. For these reasons, declaratory relief would have no effect on defendants' behavior toward plaintiff – i.e., such relief would be in the nature of an advisory opinion. Cf. Rhodes v. Stewart, 488 U.S. 1, 4 (1988) (quoting Hewitt v. Helms, 482 U.S. 755, 761 (1987)). Defendants' motion in this respect is GRANTED.

H.     *Younger* Abstention and Plaintiff's State Constitutional Claim

With respect to Count IX of the Amended Complaint, which alleges that defendants denied plaintiff a "thorough and efficient public education" in violation of Article VIII, § 4, ¶ 1 of the State Constitution (Am. Compl. ¶¶101-104), defendants urge the Court to abstain from reviewing this claim, because adjudication would interfere with ongoing State court proceedings that implicate important State interests. See Younger v. Harris, 401 U.S. 37 (1971); Pennzoil Co.

25

v. Texaco, Inc., 481 U.S. 1 (1987).  Defendants argue that the State Supreme Court, in Abbott v.

Burke, 119 N.J. 287 (1990), held that the State public education system was unconstitutional, and

that the Supreme Court is continually reviewing the State's attempts to comply with its ruling.

Abstention under the U.S. Supreme Court's holdings in Younger and Pennzoil is

appropriate only when "(1) there are ongoing state proceedings that are judicial in nature; (2) the

state proceedings implicate important state interests; and (3) the state proceedings afford an

adequate opportunity to raise federal claims."  Schall v. Joyce, 885 F.2d 101, 106 (3d Cir. 1989).

Here, defendants fail to establish the first prong of the test, namely, the existence of ongoing

State proceedings.  Specifically, defendants fail to identify what proceeding is currently pending

in State court.  Instead, they cite State Supreme Court rulings, the most recent handed down in

July 2003, resolving certain disputes stemming from earlier holdings and orders.  It is clear from

abstention jurisprudence, however, that the abstention doctrine concerns itself only with federal

"intervention" in state proceedings that a plaintiff desires to bypass.  See Younger, 401 at 53-54;

Schall, 885 F.2d at 106-07.  To the Court's knowledge, there are no such identifiable State court

proceedings currently pending to which the Court would be compelled to apply principles of

comity and the like by refraining to intervene.  Accordingly, the Court will not abstain pursuant

to Younger and its progeny.

I.    The Doctrines of *Res Judicata* and Collateral Estoppel as Applied to Plaintiff's
      State Constitutional Claim

Defendants' also argue that Count IX is barred by issue and claim preclusion, i.e., the

doctrines of res judicata and collateral estoppel.  The aforementioned Abbott litigation, they

contend, already resolved the constitutional issues raised by the Amended Complaint.

26

The Court rejects this argument.  Defendants essentially submit that, because <u>Abbott</u>, a case where plaintiff was a class member, found that the State's public education system was not "thorough and efficient," plaintiff's current claim that he was denied a thorough and efficient public education is <u>ipso</u> <u>facto</u> barred.  (<u>See</u> Defs.' Br. at 39; Defs.' Reply Br. at 11.)  Clearly, however, the mere holding that a plaintiff has suffered from violations of a particular constitutional provision does not preclude future claims simply because they allege violations of that same provision.  That a plaintiff was compelled, for example, to eat lunch in a school's basement for want of adequate facilities, <u>see</u> <u>Abbott</u>, 119 N.J. at 361, has little or nothing to do with whether his needs as a dyslexic student were accommodated as he was trying to learn how to read and write.  Having cursorily examined the hundreds of pages of <u>Abbott</u> rulings – it is defendants' responsibility to point out the specific holding that bars subsequent litigation, and they failed to do so – there does not appear to be any holding therein that squarely addresses plaintiff's allegations even generally, let alone vis-a-vis plaintiff's specific circumstances.  Therefore, there exists no judgment on the merits of the allegations in Count IX that would preclude this claim.  <u>See</u> <u>United States v. Athlone Indus., Inc.</u>, 746 F.2d 977, 983 (3d Cir. 1984).  Consequently, for these reasons, and for the reasons set forth in Part II.G, Count IX survives summary judgment and defendants' motion in this regard is DENIED.

III.    *Summary*

In light of the foregoing, and as a consequence of the Court's Order of February 19, 2004 dismissing certain defendants, the following counts of the Amended Complaint remain:

(1) Count I (IDEA violations by remaining defendants for denial of FAPE);

(2) Count II (IDEA violations by remaining defendants for failure to train and adopt

standards);

(3) Count IV (Section 504 violations by DOE);

(4) Count VIII (Section 504 and IDEA violations by defendants Gantwerk and Zangrillo as enforced through § 1983);

(5) Count IX (State Constitutional violations by DOE);

(6) Count X (LAD violations by DOE).

Plaintiff's prayer for declaratory relief under 28 U.S.C. § 2201 is dismissed.

## <u>CONCLUSION</u>

For the reasons set forth above, defendants' motion for summary judgment is GRANTED

IN PART and DENIED IN PART.  An appropriate Order will follow.


DATED: April 21, 2005                              /s/ Jose L. Linares
                                                   United States District Judge